IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| LESLIE D. LOCKWOOD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| ) | CIV-11-1159-HE |
| v. ) | |
| ) | |
| MICHAEL J. ASTRUE, ) | |
|   Commissioner of Social Security ) | |
|     Administration, ) | |
| ) | |
| Defendant. ) | |

REPORT AND RECOMMENDATION

Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of Defendant Commissioner denying her concurrent applications for disability insurance and supplemental security income benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1382. Defendant has answered the Complaint and filed the administrative record (hereinafter TR___), and the parties have briefed the issues. The matter has been referred to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B). For the following reasons, it is recommended that the Commissioner's decision be affirmed.

I. Background

On April 20, 2009 (protective filing date), Plaintiff filed an application seeking benefits and alleged that she became disabled on April 9, 2009. (TR 110-116). At that time,

Plaintiff was 41 years old. She alleged disability as a result of monocular vision and "balance issues" due to a prosthetic eye, anxiety, chronic back pain, and diverticulitis. (TR 123). Plaintiff described previous jobs as a waiter, casino worker, line operator in a poultry plant, laundry worker, and telephone sales representative. (TR 123). Plaintiff has a high school equivalency education, and she last worked in April 2009 as a full-time casino dealer and food sales clerk. (TR 134, 158). Plaintiff's applications were denied initially and on reconsideration. (TR 58-61).

At Plaintiff's request, a hearing *de novo* was conducted before Administrative Law Judge Headrick ("ALJ"), at which Plaintiff and a vocational expert ("VE") testified. (TR 22-47). Following the hearing, the ALJ issued a decision in which the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act. (TR 9-17). The Appeals Council declined to review this decision. (TR 1-3).

II. Standard of Review

Plaintiff now seeks judicial review of the final decision of the Defendant Commissioner embodied in the ALJ's determination. Judicial review of a decision by the Commissioner is limited to a determination of whether the Commissioner's factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied. Wilson v. Astrue, 602 F.3d 1136, 1140 (10th Cir. 2010); Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003). The "determination of whether the ALJ's ruling is supported by substantial evidence must be based upon the record taken as a whole. Consequently, [the Court must] remain mindful that evidence is not substantial if it is

overwhelmed by other evidence in the record." Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009)(citations, internal quotation marks, and brackets omitted).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i).  The Commissioner follows a five-step sequential evaluation procedure to determine whether a claimant is disabled. Doyal, 331 F.3d at 760. In the first four steps of this process, the claimant has the burden of establishing a prima facie case of disability. Id.  At the fifth and final step of the requisite sequential evaluation process, the burden shifts to the Commissioner "to show that the claimant retains sufficient [residual functional capacity] . . . to perform work in the national economy, given her age, education and work experience." Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007)(internal quotation and citation omitted).

III. Medical Record

The medical record submitted by Plaintiff reflects that she has been treated since December 2006 with medications for low back pain, diverticulitis, and hypertension.  In physical examinations conducted in December 2006, August 2007, December 2008, and February 2009, Plaintiff consistently exhibited full range of motion and normal gait.  (TR 242-243, 286-288, 254-257, 344-346). In February 2009, Plaintiff's treating physician noted her hypertension was controlled with medication. (TR 344-346).  In April 2009, Plaintiff again exhibited normal findings on physical examination. (TR 352).

Plaintiff stated that she stopped working on April 9, 2009, due to her medical impairments. (TR 134). However, in a physical examination conducted by her treating physician's assistant, Mr. Green, on April 23, 2009, Mr. Green noted that Plaintiff exhibited no abnormal findings, full, painless range of motion of all major muscle groups, and she exhibited appropriate affect and demeanor. (TR 351-352). Plaintiff admitted she had not been taking her prescribed medications for diverticulitis. (TR 352). Prescriptions for medications for diverticulitis of small intestine, fatigue, "controlled" hypertension, breast pain, irritable bowel syndrome and premature menopause were refilled. (TR 352).

In May 2009, Plaintiff returned to Mr. Green for follow-up treatment. Mr. Green noted Plaintiff informed him she had been treated for bipolar disorder in 1999 and that she was not working "due to pain [and] depression." (TR 379). Plaintiff was prescribed Seroquel®[1], Lortab®, a narcotic pain medication, and Prilosec®, a medication used to treat gastrointestinal reflux disease. (TR 379). In June 2009, Mr. Green noted Plaintiff exhibited "decreased" back and knee range of motion, and that the same medications were refilled. (TR 412-413).

In a consultative visual examination conducted in July 2009, the examiner, Dr. Hansen, reported that Plaintiff exhibited normal sight in her right eye (with minor near-sightedness without eyeglasses) and a prosthetic in her left eye due to previous retinoblastoma. (TR 382). Dr. Hansen noted Plaintiff "navigated the office without

---

[1] Seroquel is a medication used to treat the symptoms of mania or depression in patients with bipolar disorder. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001030/

assistance." (TR 382). In September 2009, magnetic resonance imaging ("MRI") testing of Plaintiff's lumbar spine was interpreted as showing mild degenerative changes with no disc herniation or stenosis. (TR 428).

Plaintiff underwent an initial psychiatric evaluation at a mental health clinic in May 2009 conducted by Dr. Vaidya. (TR 463-465). Plaintiff reported she had experienced depression on and off since childhood and anxiety "for years." Although she had previously been diagnosed with bipolar disorder she had never attempted suicide, been hospitalized for mental health treatment, or undergone counseling. Plaintiff reported that she was taking Seroquel® prescribed by Mr. Green which helped her sleep and "get around and get things done." (TR 463). She reported she also took narcotic pain medication two to three times a day since 2002 for low back pain and hypertension medication. Plaintiff stated she quit her job at a casino as a food sales clerk in April 2009 because of back and abdominal pain. She reported she previously worked as a meat packager for 1½ years and that she could not work due to social anxiety and being self-conscious about her prosthetic eye. Dr. Vaidya noted a diagnosis of bipolar disorder, type II[2], generalized anxiety disorder, and social phobia, for which counseling was recommended.

Dr. Vaidya's notes reflect the psychiatrist saw Plaintiff for follow-up treatment on seven occasions between May 2009 and March 2010. (TR 461-462, 468-469, 505). In June

---

[2]"Bipolar II Disorder is defined by a pattern of depressive episodes shifting back and forth with hypomanic episodes, but no full-blown manic or mixed episodes." http://www.nimh.nih.gov/health/publications/bipolar-disorder/complete-index.shtml.

2009, Dr. Vaidya prescribed a mood stabilizing medication for Plaintiff. (TR 461).

In July 2009, Plaintiff reported to Dr. Vaidya that she was not motivated to do anything except going to stores, sitting on her porch, and walking around her home. (TR 461-462). However, a friend visited her every day. (TR 462). In August 2009, Plaintiff reported that her 18-year-old daughter had moved out and that her usual activities included checking her e-mail messages, watching television, and keeping her house clean. (TR 462). She denied suicidal thoughts, and Dr. Vaidya recommended Plaintiff see a therapist. (TR 462).

In August 2009, Mr. Green prescribed anti-anxiety medication and refilled her Lortab prescription. (TR 409). In September 2009, Plaintiff underwent a psychiatric assessment at the Edwin Fair Community Mental Health Clinic ("Edwin Fair Clinic"), and Ms. White, who conducted the evaluation, indicated Plaintiff had been referred by Dr. Vaidya for counseling. (TR 443-444, 457). Plaintiff was assessed as having bipolar disorder, type II, and anxiety disorder not otherwise specified. (TR 443-444). During the evaluation, Plaintiff complained of excessive "stress" affecting her anxiety and mood, a "recent conflict" with her daughter, "trouble getting along with others," and "low self-esteem and social anxiety due to having only one eye." (TR 444). Ms. White noted that in a mental status examination conducted on September 4, 2009, Plaintiff exhibited an anxious and tearful mood and poor eye contact. (TR 455). Ms. White noted Plaintiff also exhibited no thought, orientation, memory, speech, or affect impairments, and she exhibited average intellect and good interpersonal skills. (TR 455).

In October 2009, Dr. Vaidya noted Plaintiff denied suicidal thoughts and the dosage

of Plaintiff's mood stabilizing medication was reduced. (TR 468-469). In December 2009, Dr. Vaidya noted that Plaintiff's affect was "bright," she was no longer taking Seroquel® because of side effects, she was seeing a case manager who had "helped" her, she denied suicidal thoughts, and she reported she was walking more and reading more and her focus had improved. (TR 505). Mood stabilizing and anti-depressant medications were prescribed for Plaintiff. (TR 505). In March 2010, Plaintiff reported to Dr. Vaidya that her medications were helpful and she had some "depressed days but not too bad." (TR 509). Her medications were continued. Later in March 2010, Plaintiff returned to her case manager at the Edwin Fair Clinic, and the case manager noted Plaintiff's report that her depression had "eased in the past few months," that her medications were helpful, but that she does not like to leave her home. (TR 516). She also stated that her medications for diverticulitis were helpful and that staying on her "strict diet" eases her symptoms. (TR 516). She reported a good relationship with her family, "a few friends" who visit her occasionally, "good transportation and [government-assistance] for her medical needs," and financial assistance from her friends and family and "money [she] saved." (TR 516).

The records of an urgent care clinic where Plaintiff was treated by Mr. Green reflect that Plaintiff returned for medication refills in August 2009, October 2009, November 2009, February 2010, April 2010, and May 2010 for diverticulitis, irritable bowel syndrome, hypertension, anxiety, and degenerative disc disease (TR 522-529, 533-538, 542-543).

At the hearing, Plaintiff testified that she had constant lower back pain that was only somewhat reduced with medication and that the pain radiated to her left hip and knee. (TR

33-34). Plaintiff stated that her vision was not as good as previously and her lack of depth perception affected her balance. (TR 34-35). She did not drive and had pain and diarrhea "every two weeks" or "six to eight days out of the month" due to diverticulitis. (TR 34-35). Plaintiff testified that her mood shifted from depression to anger, she could not get along with other people, and she did not want to leave her home. (TR 36). She had to "write things down" due to poor memory, and she had "panic attacks" in public places. (TR 37). She estimated she could sit for 30 minutes, stand for 30 minutes, walk one block, lift ten pounds, and sit or stand, alternatively, for six hours. (TR 38). Plaintiff testified she would generally lie down and use a heating pad for most of the day. (TR 39-40).

IV. <u>ALJ's Decision</u>

Following the required sequential evaluation procedure, the ALJ found that Plaintiff had not worked since April 9, 2009, her alleged onset date, and that Plaintiff had severe impairments due to blindness in her left eye, mild degenerative disc disease, diverticulitis, depression, anxiety, and social phobia. (TR 11). At step three, the ALJ found that these impairments were not *per se* disabling when considered singly or in combination. (TR 12). At step four, the ALJ found that despite her impairments Plaintiff had the residual functional capacity ("RFC") to perform work at the medium exertional level[3] "except she can perform only simple tasks with minimal contact with the general public." (TR 13-15). In light of this

---

[3]Medium work is defined in the agency's regulations as work involving lifting up to 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. 20 C.F.R. §404.1567(c)(2004).

RFC and Plaintiff's vocational characteristics, , *i.e.*, her age, education, and work history, the ALJ found that Plaintiff was not disabled because she retained the capacity to perform her past relevant work as a laundry worker or line worker. (TR 15-16). Reaching the fifth step of the sequential evaluation process, the ALJ alternatively found that there were other jobs existing in the national economy which Plaintiff was capable of performing, including the jobs of janitor, press machine operator, production inspector, or machine operator. (TR 15-16).

V. <u>Medical Source Statements</u>

Plaintiff contends that the ALJ erred by failing to discuss the medical source statement authored by Mr. Green, Plaintiff's treating physician's assistant, and that Mr. Green's opinion as to Plaintiff's functional abilities should have been adopted by the ALJ in the step four RFC determination. Specifically, Plaintiff points to Mr. Green's opinion set forth in the medical source statement concerning Plaintiff's ability to stand or walk, lift and/or carry, and bend. (<u>See</u> TR 399-401).

In a physical medical source statement completed by Mr. Green in May 2010, Mr. Green stated that Plaintiff could sit for one hour, stand for one hour, walk for one hour, occasionally lift and carry 10 pounds, could not bend or squat, and was markedly limited in her ability to work around unprotected heights or moving machinery. (TR 539-540). Mr. Green also stated that Plaintiff could occasionally crawl, climb, and reach, and she was mildly limited in her ability to work in environments with marked changes in temperature and humidity, with dust, fumes, or gases, requiring driving, and involving work with

vibrating equipment. (TR 540).  As objective findings supporting these limitations, Mr. Green stated that Plaintiff has an "artificial eye," degenerative disc disease of her lumbar spine, and irritable bowel syndrome due to diverticulitis. (TR 540).

When an ALJ considers the opinion of a disability claimant's treating physician, the ALJ must follow a specific procedure in analyzing the medical opinion.  The regulations define "medical opinions" as:

> statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions.

20 C.F.R. §§ 404.1527(a), 416.927(a).  Generally, an ALJ must give the opinion of an acceptable treating source controlling weight if it is both well-supported by medically acceptable clinical and laboratory diagnostic techniques and consistent with other substantial evidence in the record. Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003) (quoting SSR 96-2p, 1996 WL 374188, at *2).  "[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight." Id.

The ALJ recognized in his decision that Mr. Green had completed a medical source statement and that Mr. Green's findings set forth in the opinion indicated Plaintiff was not capable of performing sedentary work. (TR 14).  The ALJ also recognized that under the regulations physician's assistants are not acceptable medical sources although a physician's assistant is considered another source for medical evidence.

Because Mr. Green was not an acceptable medical source, his opinion concerning Plaintiff's functional limitations was not entitled to "more weight" under the pertinent regulations. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The regulations allow administrative factfinders to consider "evidence from other sources to show the severity of [a disability claimant's] impairment(s) and how it affects [the claimant's] ability to work," including evidence from chiropractors and therapists. 20 C.F.R. § 404.1513(d). Social Security Ruling ("SSR") 06-3p "recognizes the potential value of opinions from medical sources who are not 'acceptable medical sources.'" Bowman v. Astrue, 511 F.3d 1270, 1275 n. 2 (10th Cir. 2008). However, the ruling clarifies that "it is still necessary to distinguish between 'acceptable medical sources' and other medical sources." Id. The distinction is critical because, as the ruling points out, "[i]nformation from . . . 'other [medical] sources' cannot establish the existence of a medically determinable impairment" or "be considered treating sources . . . whose medical opinions may be entitled to controlling weight." SSR 06-03p, 2006 WL 2329939, at * 2.

The ALJ reasoned in his decision that he had considered Mr. Green's opinion set out in the medical source statement but had given the opinion "little weight . . . in light of the fact that radiographic evidence has never shown more than mild findings." (TR 14). The ALJ's rationale for giving less weight to Mr. Green's opinion is well supported by objective evidence in the record. Two MRI tests of Plaintiff's lumbar spine conducted in June 2008 and in September 2009 were interpreted as showing only mild degenerative changes without evidence of herniation or stenosis. (TR 228, 428).

In her brief, Plaintiff makes a disingenuous argument that because Mr. Green was "acting under the supervision" of a physician, Dr. Shuart, that Mr. Green's medical source statement and treatment records should be considered to be those of the supervising physician. Plaintiff's Brief, at 10. However, nothing in the record reflects that Dr. Shuart ever examined or treated Plaintiff. Therefore, neither Mr. Green's opinion set forth in the medical source statement or Mr. Green's record of treatment of Plaintiff can be attributed to a treating physician. No error occurred with respect to the ALJ's consideration of Mr. Green's medical source statement, and the ALJ did not err in giving "little weight" to, and failing to incorporate into the RFC assessment, Mr. Green's opinion concerning Plaintiff's functional limitations.

Plaintiff next contends that the ALJ failed to discuss the mental RFC assessments completed by Dr. Vaidya and that the findings in these RFC assessments should have been adopted by the ALJ as part of the RFC determination at step four. In a mental status form signed by Dr. Vaidya, Plaintiff's treating psychiatrist, on September 30, 2009,[4] Dr. Vaidya noted that Plaintiff "will be able to carry out simple tasks but will have difficulty [with] complex ones" due to her mental impairments of bipolar disorder, type II, generalized anxiety disorder, and social phobia. (TR 460).

In a separate mental functional assessment questionnaire completed by Dr. Vaidya on September 30, 2009, the psychiatrist noted that she was treating Plaintiff for a mental

---

[4]The mental status form indicates that August 5, 2009, was the date of Dr. Vaidya's examination but that the form was completed on September 30, 2009. (TR 460).

impairment, that Plaintiff's mental impairment imposed more than minimal limitations, that Plaintiff's symptoms included "mood swings, anxiety around people, is fearful, [and] has depression," and described Plaintiff's functional limitations as "can't be around people," "can't handle stress," "can't work [at] a persistent pace," and "can't concentrate." (TR 459).

In a mental RFC assessment dated January 6, 2010, and signed by Dr. Vaidya and a therapist, Ms. Smith, Dr. Vaidya and Ms. Smith opined that Plaintiff was "markedly limited" in her ability to function in many areas. (TR 506-508). As reasons for these findings, the RFC assessment sets forth the following statement:

> Leslie experiences social anxiety on a near daily basis as she has panic attacks in public. During these attacks, Leslie experiences difficulty breathing, increased feelings to run away and willingness to leave behind needed items. Leslie procrastinates when thinking about going into public and often asks others to go for her. Leslie has low frustration tolerance with others as she states she gets mad at others easily. After the incident, she feels remorse. This increase in stress and anxiety tends to cause flare-ups of Leslie's diverticulitis which causes a great amount of pain. This pain causes difficulty sleeping and maintaining a regular daily routine.

(TR 508).

The ALJ recognized in his decision that Dr. Vaidya had submitted an assessment on the mental status form dated August 5, 2009, and that Dr. Vaidya had also submitted an opinion concerning Plaintiff's functional abilities in the January 10, 2010 medical source statement. (TR 14). Recognizing that treating physician's opinions are given controlling weight in certain circumstances, the ALJ reasoned that

> Dr. Vaidy's opinion that the claimant has marked limitations in

> most areas of mental functioning is in direct conflict to her statement four months earlier that the claimant could perform simple tasks. In addition, it is in direct conflict with her own treatment records. . . . On March 19, 2010, the claimant stated that she had depressed days 'but not too bad' . . . . On March 22, 2010, the claimant stated that her depression had eased in the past few months. . . . While the undersigned has carefully considered Dr. Vaidya's opinion, it cannot be given controlling weight because it is in conflict with Dr. Vaidya's own treatment records and inconsistent with the other substantial evidence as noted above.

(TR 14-15).

Plaintiff's contention that the ALJ failed to address the functional limitations set forth in Dr. Vaidya's medical source statement is simply contrary to the record. Moreover, the ALJ provided well-supported reasons for not giving controlling weight to Dr. Vaidya's opinion. The record of Dr. Vaidya's brief period of treatment of Plaintiff does not support the findings of severe functional limitations contained in Dr. Vaidya's mental RFC assessment. In addition, the rationale provided by Dr. Vaidya in the medical source statement for the findings of severe functional limitations merely described Plaintiff's subjective statements of her symptoms. Therefore, the ALJ's failure to adopt the functional limitations set forth in Dr. Vaidya's RFC assessment was not error.

To the extent Plaintiff contends that the ALJ's decision erroneously included only a "biolerplate" RFC finding, this contention is also contrary to the record. The ALJ's decision includes a thorough discussion of the medical record, Plaintiff's testimony at the hearing and statements concerning her usual activities, and Plaintiff's mother's statement concerning her usual activities. (TR 13-15). Other than the references to Dr. Vaidya's medical source

statement and Mr. Green's medical source statement, both of which were rejected or given "little weight" based on reasoning well supported by the record, Plaintiff does not point to specific evidence in the record that the ALJ failed to discuss or was relevant to the RFC determination.

VI. Step Four and Alternative Step Five Finding

Plaintiff contends that the ALJ did not make adequate findings at step four with respect to Plaintiff's RFC, the demands of her previous jobs, or her ability to perform those jobs. At the fourth step of the evaluation process, the ALJ must determine whether the claimant retains the RFC to perform the requirements of all past relevant work. The claimant bears the burden of proving an inability to perform the duties of the claimant's past relevant work. See Andrade v. Secretary of Health & Human Servs., 985 F.2d 1045, 1051 (10th Cir. 1993). Nevertheless, the ALJ must undertake a three-phase analysis at step four. In the first phase, the ALJ must evaluate the claimant's RFC. See Winfrey v. Chater, 92 F.3d 1017, 1023 (10th Cir. 1996). In the second phase, the judge must determine the mental and physical demands of the claimant's past relevant work and make express findings. Frantz v. Astrue, 509 F.3d 1299, 1301 (10th Cir. 2007); Social Security Ruling 82-62, "Titles II and XVI: A Disability Claimant's Capacity to Do Past Relevant Work, in General," 1982 WL 31386, at 4 (1982). In this phase, the ALJ must obtain adequate "factual information about those work demands which have a bearing on the medically established limitations." Social Security Ruling 82-62, 1982 WL 31386, at 3; see Frantz, supra. In the third phase, the ALJ must "determine[] whether the claimant has the ability to meet the job demands found in phase two

despite the mental and/or physical limitations found in phase one." Winfrey, 92 F.3d at 1023 (citations omitted).

At the first phase of the step four analysis, the ALJ found that Plaintiff had the RFC to perform work at the medium exertional level so long as the work required no more than "simple tasks with minimal contact with the general public." (TR 13). Although Plaintiff contends that the ALJ did not discuss or make specific findings concerning Plaintiff's mental and physical limitations, the ALJ's decision contains an adequate analysis of the medical record and Plaintiff's subjective statements in connection with the RFC assessment. The ALJ stated, *inter alia*, that Plaintiff's "daily activities are consistent with the performance of simple work." (TR 15). The ALJ also reasoned that the agency's medical consultant had reviewed the record and determined that Plaintiff could perform simple tasks with routine supervision and could not relate to the general public. (TR 15). The ALJ further reasoned that a second medical consultant for the agency had reviewed the record and determined that Plaintiff was capable of performing work at the medium exertional level. (TR 15).

The ALJ's RFC finding is well-supported by the medical record, as cited by the ALJ in the decision, including two reports of MRI tests interpreted as showing Plaintiff exhibited only mild degenerative changes in her lumbar spine and the mental RFC assessment and physical RFC assessment provided by medical consultants for the agency (TR 484-486, 488-495). The only medical evidence Plaintiff points to as inconsistent with the RFC finding are the medical source statements completed by Mr. Green and Dr. Vaidya. The ALJ provided valid, well-supported reasons for not giving these opinions controlling weight, and the ALJ

provided adequate, well-supported reasons for the RFC finding. Accordingly, no error occurred.

Plaintiff contends that the ALJ erred at the second phase of the step four analysis by failing to inquire about or discuss the demands of the two jobs that the ALJ found Plaintiff was capable of performing, laundry worker and poultry plant line worker. In the ALJ's decision, the ALJ found that "[i]n comparing the claimant's [RFC] with the physical and mental demands of this [past relevant] work, the undersigned finds that the claimant is able to perform it as actually and generally performed." (TR 15). Defendant posits that even if the ALJ erred by failing to perform the requisite analysis of the mental and physical demands of these previous jobs at step four, the ALJ's alternative step five determination is supported by substantial evidence in the record and the Commissioner's decision should be affirmed. Plaintiff contends that the Commissioner is not allowed to "leapfrog" over a step four error and make an alternative step five determination. Plaintiff provides no authority for this restrictive interpretation of the agency's regulations.

The Tenth Circuit Court of Appeals has addressed the same issue of alternative step five findings and has recognized that restricting an ALJ from making an alternative step five finding would be "impractical and unprecedented. Whatever the particular result in any given case, the use of alternative dispositions generally benefits everyone; the [Commissioner] relieves a pressing work load by resolving cases thoroughly once; the courts avoid successive, piecemeal appeals, and litigants are spared the protracted delays that result when a case drags on incrementally, bouncing back-and-forth between administrative

(re)determinations and judicial review thereof." <u>Murrell v. Shalala</u>, 43 F.3d 1388, 1389 (10th Cir. 1994).

Plaintiff argues in her reply that the court in <u>Murrell</u> recognized that an alternative step five finding may be made only if the ALJ's decisions at the previous steps of the analytical process were "proper." Plaintiff's Reply, at 8. Plaintiff misreads the court's decision in <u>Murrell</u>. The court actually stated that "due to the way the [social security regulation's] sequential analysis is structured, a proper finding of disability (at step three) or nondisability (at steps two, four, or five) is conclusive and, thus, cannot be overturned by consideration of a subsequent step." <u>Id.</u> The court did not state or imply that an erroneous step four finding precluded an ALJ from reaching step five. Rather, the court reasoned that if an ALJ's finding of nondisability at step four was properly made and supported then it is irrelevant whether error could be found in the ALJ's alternative step five finding. See <u>McAnally v. Astrue</u>, 241 Fed.Appx. 515, 518 (10th Cir. 2007)(unpublished order)(affirming "ALJ's finding of nondisability at step four of the evaluation process" and declining, with citation to <u>Murrell</u>, "to consider plaintiff's step-five arguments").

Plaintiff has not challenged the ALJ's step five determination. The ALJ properly considered the relevant medical and nonmedical evidence related to Plaintiff's impairments and the ALJ's finding that she retains the capacity to perform other work available in the economy is supported by substantial evidence in the record. Accordingly, the Commissioner's decision should be affirmed.

RECOMMENDATION

In view of the foregoing findings, it is recommended that judgment enter AFFIRMING the decision of the Commissioner to deny Plaintiff's applications for benefits. The parties are advised of their respective right to file an objection to this Report and Recommendation with the Clerk of this Court on or before       September 13th      , 2012, in accordance with 28 U.S.C. § 636 and Fed. R. Civ. P. 72.  The failure to timely object to this Report and Recommendation would waive appellate review of the recommended ruling. Moore v. United States, 950 F.2d 656 (10th Cir. 1991); cf. Marshall v. Chater, 75 F.3d 1421, 1426 (10th Cir. 1996)("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived.").

This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter, and any pending motion not specifically addressed herein is denied.

ENTERED this      24th      day of      August     , 2012.

GARY M. PURCELL
UNITED STATES MAGISTRATE JUDGE